**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                     Case No. 20-20429

TERRENCE BERNARD KING, JR.,

        Defendant.
_____/

### OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Defendant Terrence Bernard King, Jr., moves[1] to suppress all evidence seized by Detroit Police Department (DPD) officers when they arrested him and conducted a warrantless search of the gray Dodge Caravan he had rented. (ECF No. 38.) The government filed a response, and Defendant filed a reply. (ECF Nos. 41, 44.) An evidentiary hearing on the motion was held on September 15, 2021.

Defendant is charged with one count of Felon in Possession of a Firearm under 18 U.S.C. § 922(g)(1). (ECF No. 13.) The firearm he allegedly possessed is a Glock, Model 23 handgun, which was recovered by DPD officers in a search that is the subject of this motion. (ECF No. 13. PageID.32; ECF No. 41, PageID.240.) Defendant argues that the DPD officers, in conducting a warrantless arrest and subsequent warrantless search of the van, violated his Fourth Amendment rights. Specifically, he argues the

_____

[1] Defendant filed a motion for extension of time to file this motion to suppress. (ECF No. 39.) The government did not contest the motion. The court grants Defendant's motion for an extension of time.

officers did not have probable cause to make an arrest, requiring suppression of any

evidence that was found thereafter. Moreover, Defendant asserts that even if the

officers did have probable cause to arrest him, the search of the van was not justified by

any exceptions to the warrant requirement, forming a second basis to call for

suppression of any evidence obtained as a result. For the reasons set forth below,

Defendant's motion will be denied.

## I.  BACKGROUND

On April 26, 2020, sometime after 1:00 AM, surveillance footage taken by a

DPD Project Green Light camera in Detroit captured Defendant driving a gray Dodge

Caravan to a liquor store. (ECF No. 43, Ex. A at 0:50–1:54.) He parked it backed-in,

with its front end toward the street. (*Id.*) Shortly after parking, Defendant emerged and

walked into the liquor store, returning to the car approximately two minutes later. (*Id.*,

Ex. A at 1:50–3:55.) Defendant can be seen on camera, dressed in a light blue zip-up

jacket with a large, white Nike "swoosh" logo on the back. (*Id.*) After he returned to the

van, it remained parked there for approximately nine minutes as several individuals

entered and exited the liquor store; at no point in this time period did Defendant or

anyone else exit Defendant's rental van. (*Id.*, Ex. A at 3:55–12:55.) The Caravan had

tinted windows, making it difficult to see on the surveillance footage what was occurring

in the van during this time. (*Id.*) Eventually, however, Defendant exited the van. He

approached and engaged in conversation the driver of the vehicle who had just parked

next to him. (*Id.*, Ex. A at 12:55–13:15.) Defendant was apparently acquainted with the

other driver as a neighbor. (ECF No. 38, PageID.218; ECF No. 27-3, PageID.164.) The

man Defendant approached was soon to be the victim of an armed robbery.

Approximately two minutes into their conversation, the rear, driver-side sliding door of Defendant's van opened. (ECF No. 43, Ex. A at 12:15–15:15.) At this point in the surveillance footage, it becomes clear for the first time that there had been a passenger in the van the entire time. (*Id.*, Ex. A at 15:15–15:25.) A man—who would soon commit the robbery—exited the van from the back seat and entered the liquor store. (*Id.*) He was wearing a dark blue sweatshirt with the hood over his head. (*Id.*) He exited the liquor store no more than about ten seconds after he had entered, now wearing a blue bandana that covered his face. (*Id.*, Ex. A at 15:35–15:45.) He immediately walked toward Defendant and the victim. (*Id.*) Although other people were here and there in the parking lot, the robber was fixated on the victim-to-be as he and Defendant stood in the parking lot speaking. (*Id.*)

The robber briefly walked past Defendant and the victim while continuing to look at them, then quickly turned to the two, and aggressively jabbed a gun into the victim's back. (*Id.*, Ex. A at 15:50–15:55.) Defendant paused for only a moment before he began to back away. (*Id.*) The robber did not appear to acknowledge him in any way. (*Id.*) It appears that Defendant momentarily stopped moving away, paused to briefly watch the robbery continue to unfold from a moderate distance, and then, as another car pulled into the parking lot toward him, resumed his walk to the van, which he entered and drove away. (*Id.*, Ex. A at 15:55–16:27.)

The robber took the victim's wallet and cellphone, but the victim managed to call 911 shortly after. (ECF No. 27-2, PageID.155; ECF No. 41, PageID.238–39.) Detroit Police Department (DPD) officers interviewed the victim and later retrieved the parking lot surveillance footage provided by the Project Green Light camera. (ECF No. 27-2,

PageID.155, 158; ECF No. 41, PageID.239.) According to DPD officers Dykema and Wilson, both of whom testified at the evidentiary hearing, there was Green Light surveillance footage in addition to the parking lot video captured in front of the liquor store. The two officers testified that they reviewed additional footage showing the van, shortly after the robbery, turn onto an adjacent street, pull over, and allow somebody— DPD believed to be the robber—to enter the van. In other words, according to DPD officers at the hearing, the officers saw Defendant and the robber rendezvous just after the commission of the robbery.[2]

The day after the robbery, April 27, 2020, DPD officers Dykema, Gill, and Cpl. Wilson were patrolling in a squad car. (ECF No. 27-3, PageID.164, 166, 168; ECF No. 41, PageID.239.) They spotted Defendant, who was wearing the same distinctive light blue Nike "swoosh" logo zip-up, standing nearby a gray Dodge Caravan which matched the description of the van used in the robbery. (ECF No. 38, PageID.218; ECF No. 41, PageID.239; ECF No. 27-3, PageID.166.) The officers recognized Defendant as being the driver of the van in the surveillance footage, and they had seen a gray Dodge Caravan being used in the robbery the previous night. (ECF No. 27-3, PageID.164–68.) They watched him walk away from the van into the convenience store down the street. (ECF No. 27-3, PageID.164, 166, 168.) The officers followed, entered the store, brought Defendant outside, and arrested him. (ECF No. 27-3, PageID.164, 166, 168; ECF No. 43, Ex. C at 0:30–3:33.) Cpl. Wilson read him his *Miranda* rights, and Defendant initially

---

[2] Two DPD officers testified at the hearing that they reviewed the surveillance footage showing Defendant and the robber rendezvous after the robbery but acknowledged that the videos no longer exist: they were not properly preserved. Neither of the officers were tasked with preserving the videos.

denied knowing anything about the robbery of the previous night. (ECF No. 43, Ex. C at 2:02–3:10.) But he soon admitted that the robber had arrived with him in the van. (*Id.*, Ex. C at 4:00–4:10, Ex. B at 3:50–4:12.) The officers found the keys to the van in Defendant's pocket. (ECF No. 38, PageID.218; ECF No. 43, Ex. B at 2:27–2:35, 8:30–10:00.)

After the arrest, the officers drove with Defendant the short distance down the street to where the van was parked. (*Id.*, Ex. C at 7:43–8:26.) There, the officers entered using the key, and conducted a search of the van's interior; under the front passenger seat they found a Glock, Model 23 handgun with an extended magazine, which was loaded with nineteen rounds. (ECF No. 27-3, PageID.163–64, 167–68; ECF No. 43, Ex. B at 10:40–11:06.) The officers seized the firearm. (ECF No. 43, Ex. B at 14:10–14:53.)

Defendant is now charged with being a felon in possession of a firearm, but not the armed robbery. (ECF No. 38, PageID.218; ECF No. 41, PageID.240.) He brings this motion to suppress any evidence acquired as a result of the search—particularly the firearm found under the passenger seat of the Caravan. (ECF No. 38, PageID.212, 219). Defendant argues that both his arrest and the search of his van violated the Fourth Amendment.

## II.  STANDARD

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The purpose of the Fourth Amendment is "to safeguard the privacy and security of individuals against arbitrary invasions by

governmental officials." *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019)

(quoting *Camara v. Mun. Court of San Francisco*, 387 U.S. 523,528 (1967)). "[W]hat the

Constitution forbids is not all searches and seizures, but unreasonable searches and

seizures." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Elkins v. United States*, 364 U.S.

206, 222 (1960)).

The Fourth Amendment "contains no provision expressly precluding the use of

evidence obtained in violation of its commands." *Herring v. United States*, 555 U.S. 135,

139 (2009) (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). Over the course of many

years, the Supreme Court developed the "exclusionary rule," which "forbids the use of

improperly obtained evidence at trial." *Id.* The rule is "designed to safeguard Fourth

Amendment rights generally through its deterrent effect" and is not a "necessary

consequence of a Fourth Amendment violation." *Id.* at 139–40, 141 (quoting *United

States v. Calandra*, 414 U.S. 338, 348 (1974)); *Davis v. United States*, 564 U.S. 229,

236–37 (2011) (citations removed) ("Exclusion is not a personal constitutional right, nor

is it designed to redress the injury occasioned by an unconstitutional search. The rule's

sole purpose . . . is to deter future Fourth Amendment violations.").

The exclusionary rule serves to "prohibit[] introduction into evidence materials

seized during an unlawful search, and of testimony concerning knowledge acquired

during an unlawful search." *United States v. Howard*, 621 F.3d 433, 451 (6th Cir. 2010)

(quoting *Murray v. United States*, 487 U.S. 533, 536–37 (1988)). It also prohibits "the

introduction of derivative evidence, both tangible and testimonial, that is the product of

the primary evidence, or that is otherwise acquired as an indirect result of the unlawful

search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." *Id.*

In deciding whether evidence was obtained improperly through an illegal search and seizure, "the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667, 679 (1980); Fed. R. Civ. P. 104(a) ("The court must decide any preliminary question about whether . . . evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.").

### III. DISCUSSION

### A.  Defendant's Arrest Was Constitutional

It is a fundamental principle of the Fourth Amendment that an arrest made without probable cause is an unreasonable seizure. *See United States v. Abdi*, 463 F.3d 547, 557 (6th Cir. 2006); *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964). While a warrant is generally required, a valid, reasonable arrest occurs where "the arrest is in public and there is probable cause to believe that a criminal offense has been or is being committed." *Abdi*, F.3d at 557.

Probable cause to make an arrest is more than "mere suspicion" of criminal activity. *United States v. Anderson*, 923 F.2d 450, 454 (6th Cir. 1991). Rather, probable cause means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). The inquiry requires examining "the events leading up to the arrest" and deciding "whether these historical

facts, viewed from the standpoint of an objectively reasonable . . . officer," constitute probable cause. *Abdi*, 463 F.3d at 558 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "Probable cause is a 'practical and common-sensical standard' based on 'the totality of the circumstances.'" *Smith v. City of Wyoming*, 821 F.3d 697, 715 (6th Cir. 2016) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

In this case, the DPD officers had ample probable cause to arrest Defendant. The officers who made the arrest, especially Cpl. Wilson and Officer Dykema, were all aware that an armed robbery had occurred the night before at a liquor store nearby, involving a gray Dodge Caravan and two suspects. (ECF No. 27-3, PageID.164, 166, 168.) Cpl. Wilson and Officer Dykema had previously reviewed the Project Green Light surveillance videos, and thus when the officers initially spotted him, they immediately recognized Defendant, who was wearing the same, distinctive Nike jacket and standing just outside of what appeared to be the same gray Dodge Caravan. (*Id.*, PageID.164.) His long "dreads" hairstyle also matched from the video. In fact, in her bodycam footage, Cpl. Wilson can be heard stating she had reviewed the surveillance video the morning before the arrest "over and over and over and over again." (ECF No. 43, Ex. C at 11:33–11:45.)  It was entirely reasonable for Cpl. Wilson and the other officers to connect Defendant with the robbery. Yet, Defendant argues that the police lacked probable cause because even if the officers recognized him from the video, there was "no evidence" that Defendant had any involvement in targeting and robbing the victim. (ECF No. 44, PageID.265–66.) The court disagrees; Defendant is easily viewed as an aider and abettor to the principal's actions. The evidence the officers relied upon is

more than sufficient "to warrant a prudent person in believing, in the circumstances shown," that Defendant played a role in the robbery. *DeFillippo*, 443 U.S. at 37.

The surveillance footage of the robbery shows that Defendant drove the robber to the scene of the crime in a van (ECF No. 43, Ex. A at 0:50–1:55, 15:10–15:54); the pair were together in the van, which had tinted windows, for an extended period of time, several minutes (ECF No. 43, Ex. A. 3:56–12:55); and the robber targeted the specific individual with whom Defendant was speaking, despite there being other potential victims. (ECF No. 43, Ex. A. at 15:33–15:54.). Moreover, the surveillance video shows that the robber did not even acknowledge Defendant, negating any argument that Defendant felt threatened or worried that he would be robbed too. (ECF No. 43, Ex. A at 15:54– 16:25; ECF No. 43, Ex. C at 4:44–4:53.) Viewed from the perspective of an objectively reasonable officer, this arouses substantially more than "mere suspicion." Instead, a natural, common-sense conclusion of the surveillance footage is that Defendant and the robber worked together to coordinate a robbery, i.e., that Defendant and his cohort saw the victim arrive, and decided to set him up for a robbery. Defendant would approach the target and engage him in small talk, distracting him while the robber prepared to sneak up on him from behind. A plan of that sort would maximize the surprise and minimize the likelihood of the victim's flight or counter-attack.

But as if this evidence were not sufficient, the officers also testified that additional video showed the van, driven by Defendant, turning onto an adjacent street immediately after the robbery, stopping only to pick up the robber just after the commission of the crime. These facts show far more than mere coincidence. The existence of probable cause, given all this testimony, is simply unquestionable.

Finally, Defendant argues that because his initial arrest was for aiding and abetting a robbery, and since he has not been charged with robbery, any evidence stemming from his arrest must be suppressed. (ECF No. 38. PageID.221.) Not so. As the Supreme Court explained, "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime." *DeFillippo*, 443 U.S. at 36. Even a suspect's subsequent acquittal of an offense he is arrested for is "irrelevant to the validity of the arrest." *Id.* And crucially, the Sixth Circuit has made clear that a police officer's "knowledge of the *precise* crime committed is not necessary to a finding of probable cause provided that probable cause exists showing that a crime was committed." *Anderson*, 923 F.2d at 457 (emphasis added). *See also United States v. Reagan*, 401 F. App'x 14, 16 (6th Cir. 2010) ("We need not decide whether [officers] did in fact have probable cause to arrest on the felony weapons charge because, in any event, probable cause existed to arrest for the misdemeanor weapons offense.").

Defendant is before the court for violating 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm, rather than an armed robbery charge. But that is immaterial to the validity of the arrest. *See DeFillippo*, 443 U.S. at 36. At the time the officers arrested Defendant, probable cause existed because the facts and circumstances within the officers' knowledge were "sufficient to warrant a prudent person, or one of reasonable caution, in believing" that Defendant was a factor in the armed robbery. *See id.* That they did not have knowledge of his prior felonies leading to a charge of Felon in Possession of a Firearm is irrelevant for purposes of the arrest. As explained above, they had ample evidence to identify Defendant and conclude that he was implicated as

an accessory in the armed robbery. Therefore, probable cause existed supporting the arrest, and officers did not violate the Fourth Amendment in arresting Defendant.[3]

### B. Search of Defendant's Vehicle Was Constitutional

Defendant argues, secondly, that the search of the Dodge Caravan was unconstitutional, and thus, any evidence found therein must be suppressed. (ECF No. 38, PageID.219–224.) A warrantless search is *per se* unreasonable unless it falls into one of the established exceptions. *See Katz v. United States*, 389 U.S. 347, 357 (1967). "The government bears the burden of demonstrating an exception to the warrant requirement." *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019) (citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)).

The government offers three arguments for the constitutionality of the search: (1) the search was a valid search incident to arrest; (2) the search was valid under the automobile exception to the warrant requirement; and (3) even if the search was improper, the evidence would have been found pursuant to a valid automobile impoundment inventory procedure and is thus admissible under the doctrine of inevitable discovery. (ECF No. 41, PageID.240–48.)

---

[3] Defendant claims that probable cause is vitiated because, he argues, Cpl. Wilson "lied" about seeing a video that showed "the robber reentering [Defendant's] vehicle after the robbery and the two of them driving away together." (ECF No. 44, PageID.269–70; ECF No. 43, Ex. C at 6:51–7:06.) It appears that Defendant's argument and accusation were crafted before the DPD officers were questioned about the additional Green Light videos (and their non-preservation), and provided detail much more abundant than found in the summary police arrest reports. Even if the court were to assume that there was no such video, probable cause—measured by an objective standard—nonetheless exists because the facts and circumstances in the store parking lot would *still* lead a prudent person to believe that Defendant had committed an offense. *See DeFillippo*, 443 U.S. at 37. But two officers testified under oath that they reviewed such a video the morning before the arrest, further supporting the existence of probable cause.

### 1. Vehicle Search Incident to an Arrest

A search incident to lawful arrest is an established exception to the warrant requirement, and in some circumstances, its scope extends to the search of automobiles. *See Arizona v. Gant*, 556 U.S. 332, 339, 343 (2009). The Supreme Court in *Gant* held that it is constitutionally permissible for police to "search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 351. The Sixth Circuit adopted this rule and has emphasized that the exception is justified by the interests of ensuring officer safety and safeguarding potential evidence. *See United States v. Johnson*, 627 F.3d 578, 584 (6th Cir. 2010) (upholding a search of a vehicle incident to an arrest where officer safety was no longer a concern but where police "reasonably believed" there was evidence of the crime in the vehicle).

Although the government and Defendant only briefly addressed the issue at the evidentiary hearing, the threshold question is whether Defendant can be considered a "recent occupant" under *Gant*. The definition of "recent occupant" has never been clarified by the Supreme Court or the Sixth Circuit. *See, e.g.*, *United States v. Jones*, 155 F. App'x 204, 207 (6th Cir. 2005) (noting the Supreme Court "expressly declined to define" the term "recent occupant"); *United States v. Laughton*, 437 F. Supp. 2d 665, 672 (E.D. Mich. 2006) ("[T]here is little Sixth Circuit guidance on the question of when an arrestee remains a recent occupant of a motor vehicle."). However, courts agree that "an arrestee's status as a 'recent occupant' may turn on his temporal or spatial relationship to the car at the time of the arrest and search." *See Thornton v. United*

*States*, 541 U.S. 615, 622 (2004); *Van Heck v. County of Macomb*, No. 08-cv-13886, 2011 WL 39133, at *6 (E.D. Mich. Jan. 6, 2011) (noting that the vague definition of "recent occupant" appears to be the same before and after *Gant).* Courts also acknowledge that an arrestee's status as a recent occupant of a vehicle "certainly does not turn on whether he was inside or outside the car when the officer first initiated contact with him." *See Thornton*, 541 U.S. at 622.

 In this case, even though it was "reasonable to believe the vehicle contain[ed] evidence of the offense of arrest," it is less clear that Defendant should be considered a recent occupant of the Dodge Caravan.[4] The officers did not see Defendant in the van that day. (ECF No. 27-3, PageID.164, 166, 168; ECF No. 43, Ex. C, 13:39–13:48.) Although he was not spotted in the van before they followed him down the street, they did see him standing nearby; they knew that the van did not, as the court noted at the hearing, drop out of the sky to arrive at that location that day—*someone* drove it there; and they knew he had the key fob in his pocket; finally, they saw him on the videos driving it the previous night. (ECF No. 27-3, PageID.164, 166, 168; ECF No. 43, Ex. C at 0:30–1:50.) Even so, his status as a recent occupant—temporally and spatially—may

---

[4] Also unclear is the definition of "reasonable to believe." In *Thomas v. Plummer*, the Sixth Circuit evaluated two widely accepted definitions of "reasonable to believe." 489 F. App'x 116, 121–22 (6th Cir. 2012). One definition, adopted by some district courts within the Sixth Circuit, requires "looking at common sense factors and evaluating the totality of the circumstances" to determine if evidence of the arrest is within the vehicle. *Id.* (citing *United States v. Reagan*, 713 F. Supp. 2d 724, 728 (E.D. Tenn. 2010)). The other definition permits a search of a vehicle incident to arrest only if "the offense of arrest of an occupant of a vehicle is, by its nature, for a crime that might yield physical evidence." *Id.* at 121 (quoting Brown v. State, 24 So. 3d 671, 681 (Fla. Dist. Ct. App. 2009)). However, the Sixth Circuit declined to adopt a particular standard and decided the case on other grounds. *Id.* at 122.

be at least in some doubt. The court need not analyze or decide this issue definitively, though, because the officers had probable cause to search the van.

### 2.  Automobile Exception

The government further argues that the information possessed by DPD gave rise to more than a mere reasonable belief that Defendant's rental van contained evidence of the armed robbery. It contends the evidence establishes that the officers had probable cause to search the van, making the search constitutionally permissible.

The Sixth Circuit has adopted an automobile exception to the Fourth Amendment. *See United States v. Smith*, 510 F.3d 641, 647–48 (6th Cir. 2007). Under this exception, "police officers may conduct a warrantless search of a vehicle if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *Id*. at 647 (quoting *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998)).

As previously noted, probable cause is a "practical and common-sensical standard," that requires considering the "the totality of the circumstances." *City of Wyoming*, 821 F.3d at 715. Probable cause exists where "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person . . . in believing . . . that the suspect committed, is committing, or is about to commit an offense." *DeFillippo*, 443 U.S. at 37. Additionally, police officers are permitted to consider the totality of the circumstances and "make inferences based on their law enforcement training and background." *United States v. Arnold*, 442 F. App'x 207, 210 (6th Cir. 2011) (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)). In the context of the automobile exception, courts have consistently found probable cause where "there is a fair probability that contraband or evidence of a crime will be found" in a

vehicle. *United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir. 1994) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

In *Smith*, law enforcement officials were investigating the defendant for drug trafficking for several months. 510 F.3d at 643–44. The officers knew he had multiple vehicles and frequently transported and sold drugs out of them. *Id.* at 645–46. The night before the search at issue in *Smith*, officers spotted a green Pontiac Grand Am in the defendant's driveway. *Id.* at 646. The officers executed a search warrant the next day, which authorized a search of any vehicles on the premises; however, the green Pontiac was now parked in the street, and it was therefore outside the scope of the search warrant. *Id.* The officers searched the green Pontiac anyway, later arguing the search was valid due to the automobile exception. *Id.* at 647. The defendant disputed the search's constitutionality, but the Sixth Circuit agreed it was a valid search under the automobile exception. *Id.* at 649–50. The court pointed to the importance of the vehicles in the investigation, noting the officers "learned that [the defendant] owned a number of vehicles, transported drugs in vehicles, and sold drugs out of vehicles." *Id.* at 649. Moreover, an informant had "told investigators that he had observed [the defendant] driving around with approximately a kilogram of cocaine." Even though the officers did not know which specific car was used most frequently in the defendant's criminal endeavors, the search was nonetheless supported by probable cause. *Id.*

In its analysis, the *Smith* court distinguished two cases in which officers did not have probable cause to conduct a warrantless automobile search.

In the first distinguished case, *United States v. Haynes*, officers had merely "received information from authorities" that the defendant was "wanted for burglaries

and for parole violations." 301 F.3d 669, 672 (6th Cir. 2002). The arresting officers

learned that the defendant was inside a particular apartment building, went there, and

arrested him. *Id.* at 678. Subsequently, the officers searched his vehicle, which was

parked near the building, for firearms and jewelry they heard had been stolen. *Id.* at

673, 678. The Sixth Circuit held the search was unconstitutional because none of the

officers who conducted the search "had been given any information that would lead to

any more than a mere suspicion that [the defendant] stored those articles in his car." *Id.*

at 678. There was no evidence to suggest a link between the defendant's criminal acts

and his vehicle—particularly, the defendant "was not arrested at or near his car and

there was no testimony . . . from which the police could deduce a fair probability that a

search of the [car] would reveal contraband or evidence of criminal activity." *Id.* at 678.

Notably, the *Haynes* court, in a parenthetical, contrasted the case with *Chambers v.*

*Maroney*, 399 U.S. 42, 44 (1970). The *Haynes* court acknowledged that probable cause

existed in *Chambers* because a defendant's vehicle matched the description of a

vehicle "leaving the scene of a robbery, and [the] clothing of the occupants matched that

of the robbers." *See id.* at 678.

  In the second distinguished case, *United States v. Edwards*, the defendant was

arrested outside of a bank while holding a bag of cash, which was covered in red dye.

632 F.3d 633, 645 (10th Cir. 2001). Shortly after the arrest, the arresting officers

searched the defendant's car, which was parked in the bank's parking lot. *Id.* But the

Sixth Circuit held this search was illegal because the defendant was not near the car

when they found and arrested him, nor was there any evidence presented at the

suppression hearing that justified a belief that "additional contraband or evidence could be found in the vehicle." *Id.*

The *Smith* court explained the crucial distinctions between these cases: in *Haynes* and *Edwards*, the officers "had no information or evidence that suggested the vehicles in question contained contraband." *Smith*, 510 F.3d at 649. In other words, the officers could not point to "objective facts" indicating that the vehicles "might contain contraband." *Id.* By contrast, in *Smith*, the Sixth Circuit found there were direct links connecting the defendant's crimes to the vehicle. *See id.* The *Smith* court specifically noted to the officers' knowledge that the cars were used to carry out his drug crimes. *See id.*

The case presently before the court is much more like *Smith* than *Haynes* or *Edwards*. As in *Smith*, the use of a car was central to Defendant's offense of arrest. Like the defendant in *Smith* who utilized cars to execute his drug trafficking, the officers knew Defendant utilized the Dodge Caravan to assist in the execution of a robbery. (ECF No. 27-3, PageID.164, 166, 168.) Specifically, the van was used to drive Defendant and the robber—whom officers reasonably could infer were acting in concert—to the scene of the robbery. (*Id.*) Defendant and the robber waited together in the van for several minutes before Defendant appeared to target their victim. (ECF No. 43, Ex. A. 3:56 –12:55.) Common sense supports a conclusion that evidence of the robbery could be found in the van, which was pivotal in facilitating the crime. This conclusion is only amplified considering that Defendant initially represented falsely that he had no knowledge of any of the details of the robbery. (ECF No. 43, Ex. C at 2:02–3:10.) The officers, who already knew Defendant drove the van to and from the scene of

the robbery, could reasonably conclude he was trying to hide contraband or evidence in the van, and lying to them to do so.

Moreover, the facts and circumstances relied upon in conducting the search was more than generalized information that Defendant was simply "wanted," as was the case in *Haynes*. The officers here—Cpl. Wilson and Officer Dykema especially—could point to "objective facts"; they had seen footage connecting Defendant's van to the crime and describe how it played a fundamental role in the crime's commission. (ECF No. 27-3, PageID.164, 166, 168; ECF No. 43, Ex. A.) Cpl. Wilson watched the surveillance footage, including the camera views from around the corner, "over and over and over" again the morning of the arrest. (ECF No. 43, Ex. C at 11:33–11:45.) She had actual knowledge that the robbery involved *Defendant* driving a *particular van* which was used not only as the transportation to and from the scene, but it also, with its tinted windows, served as a means for the robber to remain hidden for a significant period of time. (ECF No. 27-3, PageID.165; ECF No. 43, Ex. A.) The potential of finding in the van physical evidence that could, for example, identify the robber, or learn more about the firearm used, cannot seriously be doubted.

Furthermore, just as in *Chambers*, the officers had actual knowledge*,* after reviewing the surveillance footage "over and over," that Defendant was wearing some of the *same*, *distinctive clothes* as he was during the robbery, and that he was standing outside of the *same van* used in the crime. (ECF No. 27-3, PageID.164–65.) In *Edwards*, there was no reason to connect the defendant's crimes to his vehicle, let alone any vehicle at all. By contrast, from the perspective of the officers in the present

case, the Dodge Caravan, Defendant, the robber, and the robbery itself, were all inextricably intertwined. (ECF No. 27-3, PageID.164–68; ECF No. 43, Ex. A.)

Finally, any doubt as to the existence of probable cause is eliminated by the fact that the DPD officers who conducted the search reviewed surveillance footage showing Defendant and the robber reconvening just after the robbery. The officers' testimony at the evidentiary hearing established that the officers knew the pair rendezvoused nearby. Clearly, from any reasonable officer's perspective, Defendant and the robber collaborated. DPD officers had probable cause to search the van because they knew both the robbery and the rendezvous occurred, they therefore could search to find fruits of the robbery or evidence that would identify its perpetrators inside of the van.

In short, the officers had probable cause because they could properly conclude that there was "a fair probability that contraband or evidence of [the robbery]" could be found in the van. *See Wright*, 16 F.3d at 1437. The government cites decisions from other district courts that bolster the conclusion that the DPD officers conducted a reasonable search under the Fourth Amendment. *See, e.g.*, *United States v. Salomon-Mendez*, 992 F. Supp. 2d 340, 346–48 (S.D.N.Y. 2014) (finding probable cause to search a vehicle used in a robbery months after it took place where vehicle matched description seen on video surveillance and officers sought evidence linking the defendant to the car); *United States v. Mercado-Cañizares*, 887 F. Supp. 2d 379, 384 (D.P.R. 2012) (holding that police had probable cause to search a vehicle pursuant to the automobile exception where the vehicle matched the description of a vehicle used in previous robberies). The court concludes the search of Defendant's van was valid under the automobile exception because the officers had probable cause.

### 3.  Inevitable Discovery via Inventory Search

Finally, the government argues that even if the officers' search is not justified by the automobile exception, all evidence seized would have been found via a lawful inventory search to preserve the vehicle and its contents, pursuant to valid DPD procedures. (ECF No. 41, PageID.247–48.) According to the government, had the police decided not to search the van when they initially arrested Defendant, "the firearm would have been discovered during the mandatory inventory search, and so the firearm should not be suppressed." (*Id.*) The court agrees.

The inevitable discovery doctrine permits "unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *United States v. Pritchett*, 749 F.3d 417, 437 (6th Cir. 2014) (quoting *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995)). The doctrine is properly invoked where "the facts indicate that the officers inevitably would have discovered and seized the tainted evidence by following 'routine procedures.'" *Id.* (quoting *United States v. Garcia*, 496 F.3d 495, 506 (6th Cir. 2007)). In other words, "the inevitable discovery exception to the exclusionary rule applies when . . . evidence discovered during an illegal search would have been discovered during a later legal search and the second search inevitably would have occurred in the absence of the first." *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002).

One way the government may invoke the inevitable discovery doctrine is via "[p]roof that contraband would have been detected in 'an inventory search that would inevitably follow seizure of a car.'" *United States v. Kimes*, 246 F.3d 800, 804 (6th Cir.

20

2001); *see Pritchett*, 749 F.3d at 437 (holding inevitable discovery doctrine properly invoked where police policies allowed for inventory search prior to having vehicle towed). A valid inventory search is one that "may not be undertaken 'for purposes of investigation,' and it must be conducted 'according to standard police procedures.'" *Smith*, 510 F.3d at 651. But "the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search." *Id.*

Here, the court finds that even if the officers did not have probable cause to search the van when they arrested Defendant, the van would have been searched pursuant to a valid DPD procedure governing inventories. (ECF No. 41, PageID.247–48.)  The officers and DPD were aware that the van was used in the commission of a robbery the previous day. Pursuant to the DPD Manual § 204.4-4, titled "Impounded Vehicles" officers are authorized to provide for the "immediate removal of a vehicle" where, *inter alia*, "the vehicle must be seized to preserve evidence of a crime, or if there is reasonable cause to believe that the vehicle was used in the commission of a crime." (ECF No. 41-2, PageID.254.) The officers possessed reasonable cause to believe that the Dodge Caravan was used in the commission of the robbery. (ECF No. 27-3, PageID.164–68; ECF No. 43, Ex. B at 9:16–9:20; ECF No, 43, Ex. C at 2:00–4:10.) Once the vehicle was towed and impounded, the routine police procedure of searching the vehicle, so all its contents could be inventoried, would have inevitably occurred. *See, e.g.*, *United States v. Arnold*, No. 19-20193, 2019 WL 5162915, at *8 (E.D. Mich. Oct. 15, 2019) ("Once the impound decision was made, routine police procedure would have led inevitably to a search of the vehicle so that its contents could be inventoried. . . . Even if [the officer] had not searched the glovebox illegally, that compartment

eventually would have been opened, searched, and inventoried, and the gun . . . would have been found.").

In fact, the search on the scene itself was authorized as part of the inventory process by DPD Manual § 204.4-11, "Inventorying Vehicles." The manual states, "prior to being towed," that the vehicle "shall be inventoried by a member of the [DPD]." (ECF No. 41-2, PageID.254.) The "scope of an inventory search," according to the manual, incudes any areas "that may contain property, including any containers." (*Id.*) Thus, the officers acted in accordance with required DPD procedures before the inevitable inventory search of the van that would have occurred after its towing and impoundment. Whether the search first occurred at the scene pursuant to DPD procedures or later after impoundment, the firearm on the floorboard would have been found.

In sum, even if the probable-cause search of the vehicle was impermissible, it would have been searched eventually pursuant to a valid inventory search. The inevitable discovery doctrine applies to this case. Consequently, any evidence found in the van as a result of the officer's search will not be suppressed because "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *See Arnold*, 2019 WL 5162915, at *8 (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).

### IV. CONCLUSION

Defendant argues that his warrantless arrest and subsequent warrantless search of his van violated the Fourth Amendment, requiring suppression of any evidence found as a result. However, there is ample evidence supporting the government's contention that the officers had probable cause to arrest Defendant and search his van. Even

without probable cause to search the van, DPD would have searched the vehicle and seized the firearm pursuant to a valid inventory search. Suppression of any evidence is therefore not warranted in this case. Accordingly,

IT IS ORDERED that Defendant's "Motion to Suppress" (ECF No. 38) is DENIED.


s/Robert H. Cleland                            /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  September 22, 2021

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 22, 2021, by electronic and/or ordinary mail.

s/Lisa Wagner                                    /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\20-20429.KING.MotionToSuppress.MAZ.4.RHC.3.docx